UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BETTIE BURMESTER,

                    Plaintiff,

            v.                                          Case No. 15-C-1393

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                    Defendant.

## DECISION AND ORDER

This is an action for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Bettie Burmester's application for a period of disability and disability insurance benefits under Title II of the Social Security Act. She claims the decision is not supported by substantial evidence and violates several of the Commissioner's own rules and regulations. For the reasons set forth below, the Commissioner's decision will be affirmed.

## BACKGROUND

On December 20, 2010, Plaintiff, age 51 at the time, completed an application for disability and disability insurance benefits, alleging disability beginning June 26, 2008. She listed depression, degenerative disc disease, pseudo gout in left knee, osteoarthritis in both knees and left thumb, and a heart condition as the conditions that limited her ability to work. R. 333. The application was denied initially on May 11, 2011 and upon reconsideration on October 3, 2011. Plaintiff then requested a hearing before an administrative law judge (ALJ). ALJ Patrick Morrison conducted a hearing on December 10, 2012. Plaintiff, who was represented by counsel, and a vocational expert (VE) testified. R. 71–121.

During the hearing, Plaintiff, through counsel, amended her alleged onset date to September 1, 2009. R. 76. She was 5'9" and weighed 185 pounds. R. 76. She testified that her normal weight is 169 pounds. R. 77. Plaintiff stated she lived in a townhouse with her husband in Milwaukee, Wisconsin. *Id.* She completed high school and one year of technical college. R. 80. She worked as a material handler for Briggs and Stratton for many years. She then became a part-time suite attendant for the Bradley Center. R. 82. Her job duties involved ensuring that event goers had valid tickets and directing them to their seats. R. 83.

When asked to rank her impairments by severity, she responded that her back spasms, the rheumatoid arthritis in her hands and feet, knee pain, and fibromyalgia prevent her from functioning. She explained she takes pain medication, applies ice, and sits in a whirlpool for thirty minutes to relieve her back pain. R. 85–86. As to the rheumatoid arthritis in her hands and feet, Plaintiff testified that she experienced flare-ups every day. R. 88. Her hands and feet swell and shake. R. 89. She also has arthritis in her knees, and explained her left knee pain is worse than the right. R. 90. Although Plaintiff participates in physical therapy, she claimed it made the pain worse. R. 91. The ALJ also noted she has chondromalacia, gout, and right shoulder issues. R. 92–93. Plaintiff reported her hypertension is fairly well controlled. R. 95. She claimed she gets about three migraine headaches each year. The headaches last two to three days. R. 98. Plaintiff also testified that she has been diagnosed with anxiety and depression, and had been considered clinically depressed for six months. R. 95, 111. She gets about three and a half hours of broken sleep each night. R. 100.

As to her activities of daily living, Plaintiff testified that her husband helps her out of bed, but she is independent in her own self care. Her husband cooks, does the dishes, goes grocery shopping, and pays the bills, and a friend helps with the cleaning once a week. R. 101–02. Plaintiff testified

that she tries to exercise and walks her dog half a block twice a day. R. 98. She goes to church once a week and out to dinner once a month. R. 103. She occasionally uses the computer to check her email and Facebook. R. 105–06. She testified that her treating physician prescribed a cane to walk with. R. 110.

In a written decision dated January 17, 2013, the ALJ found Plaintiff was not disabled. R. 127–35. On December 31, 2013, the Appeals Council granted Plaintiff's request for review and remanded the case to the ALJ. R. 141–43. ALJ Morrison held a second hearing on June 3, 2014. R. 16–70. Both Plaintiff, who was again represented by counsel, and a VE testified. Plaintiff, through counsel, amended the alleged onset date to September 6, 2009, the day before her fiftieth birthday. R. 18.

At the time of the second hearing, Plaintiff was 54 years old. She was 5'9" and weighed 169 pounds. R. 22. Plaintiff lived in a townhouse with her husband, her 33-year-old son, and her dog. R. 23. She testified that her physical impairments included degenerative disc and joint disease in her lumbar spine, right shoulder impingement syndrome, chondromalacia in the left patella, rheumatoid arthritis in her feet and hands, neck pain, gout, high blood pressure, trochanteric bursitis in her hips, and Type II diabetes. R. 29–30, 34–39. Plaintiff testified her rheumatoid arthritis makes her feet so swollen that she cannot walk or her hands are so swollen that she cannot do housework. She indicated she received Remicade infusions every six weeks. R. 31. She testified that she takes Percocet and uses morphine for her pain. R. 32. As to her mental impairments, Plaintiff testified that she has been diagnosed with anxiety and depression. R. 41. She reported having panic attacks every three months. R. 42. She testified she gets three and a half to four hours of sleep each night and does not take naps during the day. R. 48–49.

3

Plaintiff testified that she wakes up with her husband every morning, and he dries her back after she gets out of the shower and ensures she is dressed before he leaves for work. She noted her son cooks meals and her husband grocery shops. R. 50. Although Plaintiff begins the housekeeping, her son or her husband finish the cleaning when she becomes too sore to continue. R. 51. She reported driving approximately once or twice a week, attending church twice a month, and going out to eat once a month. R. 24, 52–53. Plaintiff stated she lets her dog outside and walks around the backyard with him for 20 minutes. R. 55.

In a decision dated July 16, 2014, the ALJ found Plaintiff was not disabled. R. 148–61. Following the Agency's five-step sequential evaluation process, the ALJ concluded at step one that Plaintiff met the insured status requirements through June 30, 2014 and has not engaged in substantial gainful activity since September 7, 2009. R. 150. At step two, the ALJ found Plaintiff had the following severe impairments: rheumatoid arthritis; fibromyalgia; degenerative disc and joint disease in the lumbar spine; right shoulder impingement syndrome with tendonitis and degenerative changes in the acromioclavicular joint; mild degenerative changes in the feet, knees, and hips; depression; and anxiety. *Id.* He found her neck pain, pseudo gout, diabetes mellitus, high blood pressure, history of a healed heart lesion, and migraine headaches to be nonsevere impairments. *Id.* At step three, the ALJ determined Plaintiff's impairments or combination of impairments did not meet or medically equal any listed impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 151.

After reviewing the record, the ALJ concluded Plaintiff has the residual functional capacity (RFC) to perform light work, as defined in 20 C.F.R. § 404.1567(b), "except with no more than frequent reaching overhead with the right upper extremity and no work on ladders, ropes,

4

scaffolding, or at unprotected heights. She also is mentally limited to simple, routine, repetitive tasks requiring only simple work-related decisions with few changes in the routine work setting and no more than occasional interaction with supervisors, coworkers, and the general public." R. 153. With these limitations, the ALJ found at step four that Plaintiff is unable to perform her past relevant work as a hand packager. R. 159. At step five, however, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff can perform, such as router, price maker, or routing clerk. R. 160. Based on these findings, the ALJ concluded Plaintiff was not disabled within the meaning of the Social Security Act. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review. Thereafter, Plaintiff commenced this action for judicial review.

## LEGAL STANDARD

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not

substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. Credibility

Plaintiff asserts the ALJ improperly assessed the limiting effects of her symptoms. The Social Security regulations set forth a two-step procedure for evaluating a claimant's statements about the symptoms allegedly caused by her impairments. *See* 20 C.F.R. § 416.1529. First, the ALJ determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." *Id.* § 404.1529(a). If so, the ALJ then "evaluate[s] the intensity and persistence" of a claimant's symptoms and determines how they limit the claimant's "capacity of work." *Id.* § 404.1529(c)(1). In evaluating the intensity and persistence of a claimant's symptoms, the ALJ looks to "all of the available evidence, including your history, the signs and laboratory findings, and statements from you, your treating and nontreating source, or other persons about how your symptoms affect you." *Id.* The ALJ also considers medical opinions. *Id.* The ALJ then determines whether the claimant's statements about the intensity, persistence, and limiting effects of her symptoms are consistent with the objective medical evidence and the other evidence of record.

Until recently, the SSA viewed the evaluation of the intensity, persistence, and limiting effects of a claimant's symptoms as a credibility determination. *See* SSR 96-7p. In March 2016, the SSA

released a new ruling regarding the evaluation of a claimant's symptoms.  SSR 16-3p; "Titles II and XVI: Evaluation of Symptoms in Disability Claims," 2016 WL 1119029 (effective March 28, 2016). This new ruling supersedes SSR 96-7p.  In adopting SSR 16-3p, the SSA eliminated the term "credibility" from its sub-regulatory policy in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." 2017 WL 5180304, at *2.  The question the SSA asks under SSR 16-3p is whether the symptoms claimed are "consistent with the objective medical and other evidence in the individual's record." *Id.*  Plaintiff asserts the court should apply SSR 16-3p in reviewing the ALJ's decision.  But the SSA republished SSR 16-3p on October 25, 2017 to clarify that the regulation should only be applied to determinations and decisions issued on or after March 28, 2016.  *Id.* at *1.  Since SSR 96-7p was in effect at the time the ALJ issued his decision in this case, it is the ruling that governs my review here.

A court's review of a credibility determination is "extremely deferential." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013).  On judicial review, the court must "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)).  The court is not to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal." *Elder*, 529 F.3d at 413–14 (internal quotation marks and citations omitted).

Plaintiff first argues the ALJ used improper boilerplate in making his credibility determination.  She takes issue with the following statement in the ALJ's decision: "[A]fter careful

consideration of the evidence, the undersigned finds that although the claimant's medically determinable impairments could reasonably be expected to cause some of the symptoms of the types alleged, her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." R. 155. Plaintiff claims the use of this statement is harmful because it "gives no clue as to what the ALJ intended with regard to the first step of the assessment of the limiting effects of impairments." ECF No. 13 at 19. Although the Seventh Circuit has criticized the use of boilerplate language in an ALJ's decision as being "meaningless" and "unhelpful," *see Shauger*, 675 F.3d at 696, it has recently held that its use is "innocuous when, as here, the language is followed by an explanation for rejecting the claimant's testimony." *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013); *see also Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013) ("[T]he simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination."). The ALJ's use of boilerplate language in this case was not problematic because, as explained below, the ALJ thoroughly discussed the substantial evidence that supports his decision.

Next, Plaintiff asserts the ALJ failed to explain the weight he gave to each of Plaintiff's allegations and why he found certain statements to be untrue. An ALJ is not required to specify which of the claimant's statements were not credible. *See Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012); *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992) (noting that the ALJ need only "minimally articulate reasons for crediting or rejecting evidence of disability"). The kind of detail sought by Plaintiff is neither required nor necessary for judicial review and extends the metaphor reflected in the phrase "weighing the evidence" too far. Obviously, evidence does not have physical

weight. We speak of the weight given to a witness' testimony as a way of describing how convincing or persuasive it is. The kind of precision that measuring a material object's weight allows is not possible when talking about the "weight" given a witness' testimony. There is no standard measurement for assigning weight to witness statements or other kinds of evidence. What is required in this context is an explanation of why and in what respects the ALJ did or did not find the claimant's statements credible; not a specific measurement of weight.

Plaintiff then suggests that the ALJ improperly cherry-picked the medical record and improperly relied upon his own interpretation of the medical opinions to assess her credibility. But the ALJ's discussion of the medical evidence in relation to Plaintiff's alleged symptoms complied with the SSA's regulations and rulings. Although an ALJ may not reject a claimant's statements about the intensity and persistence of her pain or other symptoms or about the effect her symptoms have on her ability to work "solely because the available objective evidence does not substantiate [her] statements," 20 C.F.R. § 1529(c)(2); SSR 96-7p, 1996 WL 374186, at *6, this does not mean an ALJ cannot consider the medical evidence in assessing a claimant's credibility. Objective medical evidence remains "a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of an individual's symptoms and the effects those symptoms may have on the individual's ability to function." SSR 96-7p, 1996 WL 374186, at *6 (internal quotation marks and citations omitted).

Here, the ALJ noted Plaintiff alleged disability due to degenerative disc disease, osteoarthritis in her knees and left thumb, fibromyalgia, a right shoulder disorder, pseudo gout, a heart condition, depression, and anxiety. R. 153 (citing R. 333, 386–88). He indicated that the record demonstrates that Plaintiff complained of chronic joint aches and pain in her wrists, hands, back, hips, knees, and

ankles, and experienced morning stiffness that lasts for fifteen to twenty minutes. R. 154. Despite Plaintiff's allegations of disabling symptoms, however, diagnostic imaging documented only mild to moderate findings. R. 155. While Plaintiff displayed tenderness to palpation and positive FABER and Patrick's testing upon examination, imaging of Plaintiff's back revealed only mild disc desiccation and end plate degenerative changes, a small disc protrusion, and no more than moderate left foraminal narrowing without high grand central or foraminal stenosis. R. 154–55. The ALJ noted Plaintiff underwent a series of epidural steroid injections and received medication for her symptoms. She later underwent a lumbar MRI that revealed degenerative disc disease and facet arthropathy, most pronounced at L5-S1, but without high grade central or foraminal stenosis. To treat her ongoing complaints of pain, the ALJ noted Plaintiff received a series of lumbar facet injections, nerve blocks, epidural steroid injections, and radiofrequency ablation. R. 154.

The ALJ recognized that testing showed a positive rheumatoid factor and elevated sedimentation rate, consistent with a rheumatoid arthritis diagnosis. *Id.* Yet, treatment notes indicate that, by November 2012, Plaintiff's rheumatoid arthritis was better with Methotrexate and by October 2013, it was reasonably controlled with treatment. Plaintiff had only minimal joint pain and swelling as well as no significant morning stiffness or fatigue. R. 155. The ALJ noted Plaintiff had reported having diffuse generalized pain, weakness, and fatigue. During examination, Plaintiff had fifteen of eighteen tender points consistent with a diagnosis of fibromyalgia and, as a result, Plaintiff was placed on Ketoprofen. R. 154. The ALJ noted that in an October 2013 examination, Plaintiff had only mildly positive fibromyalgia tender points. R. 155. The ALJ analyzed Plaintiff's fibromyalgia under section 1.01 and listing 14.06 and concluded there is no documentation of this impairment meeting or medically equaling any of these listings or other relevant listings. R. 151.

The ALJ further recognized that Plaintiff complained of right shoulder pain in late 2008. A 2008 MRI revealed a hooked acromion and tendinosis but no full thickness tear of the rotator cuff. The ALJ noted her physician determined at a later appointment that she had positive impingement with tenderness over her acromioclavicular joint. She ultimately underwent surgical intervention for her symptoms in April 2009. R. 154. Nevertheless, the ALJ concluded her right shoulder impairment restricts her to no more than frequent reaching overhead with the right upper extremity. *Id.*

As to Plaintiff's knees, diagnostic imaging revealed patellofemoral osteoarthritis in her knees bilaterally and moderate chondromalacia of the patella. The ALJ noted subsequent imaging documented degenerative changes, a small meniscal tear, and spurring, and Plaintiff underwent surgical intervention for her knee in 2013. *Id.* Both before and after her knee surgery, however, Plaintiff maintained good function during physical examinations. She displayed normal strength and muscle tone, good range of motion, and stability in her knees, as well as full range of motion in all extremities and intact sensation. She walked with a normal gait without evidencing a need for a cane. R. 156. The ALJ stated that, within six weeks of surgery, Plaintiff reported 90% improvement, had full range of motion, only little difficulty going down stairs, and no problems walking. Plaintiff's physical therapist observed Plaintiff made a full return and evidenced no difficulty ambulating up and down a flight of stairs while carrying a ten pound weight. *Id.* In addition, imaging of Plaintiff's feet showed only mild findings and imaging of her wrists and hands were essentially unremarkable. R. 155. Plaintiff only had mild bursitis and a small joint effusion in her hips. *Id.* Upon examination, Plaintiff revealed no swelling or tenderness in her wrists, fingers, ankles, or feet, edema, laxity, clubbing, or cyanosis, and negative straight leg raise and McMurray testing. R. 156.

As to Plaintiff's mental impairments, treatment records revealed Plaintiff sought treatment in July 2011 for sadness, loneliness, depression, decreased concentration, difficulty focusing, worry, and a recent history of suicidal ideation. R. 155. Two months later, Plaintiff appeared emotionally blunted and flat, had moderate emotional despondency, and endorsed poor sleep, low energy, feeling worthless, crying spells, and occasional suicidal ideation. The ALJ noted Plaintiff was diagnosed with a mood disorder. In July 2012, Plaintiff reported feeling depressed but without suicidal ideation, and in September 2012, she claimed she felt anxious with chest pain and shortness of breath secondary to bankruptcy and relationship problems. The ALJ reported she subsequently enrolled in a partial hospitalization program to assist her in dealing with increased stress. She was discharged from the program in December 2012. Her symptoms increased in June 2013 in relation to the possibility that her husband might be laid off from his job and reported suffering panic attacks approximately every three months. Plaintiff testified that her dog stopped her suicide attempt. *Id.*

Although Plaintiff testified that she has problems with short and long-term memory as well as attention and concentration relating to her mental health symptoms, she displayed intact short and long-term memory during examinations. The ALJ noted she was oriented times three, had good communication skills, appeared cooperative, and denied delusions, hallucinations, paranoid ideation, and suicidal ideation during her consultative examination. R. 156. Plaintiff was able to recall three of the three objects immediately and after five minutes, remembered five digits forward and three in reverse, named the current president, two of the states that border Wisconsin, correctly spelled the word "world," followed a simple three-step command and ongoing conversation, interpreted proverbs, identified similarities between words, and had reasonably good insight and judgment during mental status evaluation. Plaintiff's global assessment of functioning (GAF) was rated at 70,

evidencing only mild symptoms. The ALJ noted that later that month, her GAF was assessed at 75. In addition, by July 2013, Plaintiff appeared stable on medication and had normal mental status evaluation findings. *Id.* The ALJ thoroughly discussed the medical evidence and did not err in finding the objective medical evidence inconsistent with Plaintiff's complaints of pain.

The ALJ further found that Plaintiff's inconsistent statements regarding her drug use undermined her credibility. In particular, the ALJ reported the medical records documented that Plaintiff tested positive for cocaine. When her physician informed her of the results of the test, she denied taking cocaine, which resulted in her doctor refusing to further prescribe narcotic pain medication. R. 395. Plaintiff later admitted to her treating physician that she went to a bar after arguing with her husband and used cocaine she had received from an individual at the bar. R. 436. During her consultative examination, however, she denied ever using street drugs. R. 157 (citing 609–14). Plaintiff asserts the ALJ improperly relied upon the evidence of cocaine use to evaluate her honesty. Yet, an ALJ is not prohibited from considering a plaintiff's untruthful denial of drug use when assessing credibility. The lack of candor in this area may be indicative of a lack of candor in others. *See McClesky v. Astrue*, 606 F.3d 351, 353 (7th Cir. 2010). Plaintiff's failure to be honest about her cocaine use serves as anecdotal evidence of her limited credibility. The ALJ properly incorporated Plaintiff's statements about her cocaine use as evidence of Plaintiff's lack of credibility in accordance with SSR 96-7p.

Plaintiff also argues the ALJ improperly evaluated her activities of daily living. While an ALJ must consider the claimant's daily activities as one of the factors in evaluating intensity and persistence of pain, "this must be done with care." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). An ALJ cannot place "undue weight on a claimant's household activities in assessing the

claimant's ability to hold a job outside the home." *Mendez v. Barnhart*, 439 F.3d 360, 362–63 (7th Cir. 2006). Here, the ALJ did not equate Plaintiff's ability to perform certain activities of daily living with an ability to work full time. Instead, he used her reported activities to assess the credibility of her statements concerning the intensity, persistence, or limiting effects of her symptoms. *See Pepper*, 712 F.3d at 369 ("The ALJ concluded that, taken together, the amount of daily activities Pepper performed, the level of exertion necessary to engage in those types of activities, and the numerous notations in Pepper's medical records regarding her ability to engage in activities of daily living undermined Pepper's credibility when describing her subjective complaints of pain and disability.").

In this case, the ALJ properly relied upon Plaintiff's admitted activities to assess the credibility of her statements concerning the intensity, persistence, and limiting effects of her impairments. The ALJ noted Plaintiff traveled to Las Vegas for vacation and Houston to take care of her sister. R. 156. She also participated in a book club and went out with friends. She previously reported being capable of maintaining social hygiene, performing household chores, preparing simple meals, reading for four hours per day, and driving a motor vehicle. She later testified to extremely limited social and daily functioning but also indicated she pays her cell phone bill, goes out to eat monthly, attends church twice a month, uses a computer for email and Facebook, reads, and walks her dog. R. 156–57. The ALJ observed that Plaintiff's activities suggest "she is not as limited as her allegations of disabling symptoms would indicate." R. 156. The ALJ explained that based upon the overall objective diagnostic imaging, physical examination, and mental status findings, Plaintiff's admitted high level of daily functioning contradicted her testimony and her multiple inconsistent statements. The ALJ properly followed the regulations governing the assessment of a claimant's statements concerning her pain and other symptoms.

14

The fact that reasonable fact finders could reach different conclusions based on the same evidence is not a reason to overturn the ALJ's credibility determination. Again, a court must only consider whether the ALJ's decision is supported by substantial evidence. "[S]ubstantial evidence is evidence which a reasonable mind would accept as adequate to support a conclusion, such that where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision rests with the Commissioner." *Schonenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). The ALJ's conclusion is supported by substantial evidence, is not patently wrong, and does not necessitate remand.

## B. Evaluating Medical Opinions

Plaintiff also argues that the ALJ failed to properly evaluate the opinions of Dr. Alice Bustos and Dr. Edmundo Centena, her treating physicians. She contends that the ALJ erred in failing to give their opinions controlling weight or, alternatively, in failing to apply the relevant factors to determine the weight they otherwise deserved. Under the regulations that were in effect at the time of the hearing, the ALJ was required to give "controlling weight" to a treating physician's medical opinion on the nature and severity of an impairment if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with other substantial evidence." *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010); 20 C.F.R. § 416.927(c)(2); SSR 96–2p; *see also Roddy*, 705 F.3d at 636.

The reason for the rule is that a claimant's treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations

or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). On the other hand, a treating physician can be subject to certain biases that are less likely to bear on other medical sources. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). "The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985). In addition, "the claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise." *Dixon*, 270 F.3d at 1177. Still, when the opinion of a treating physician is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence, it is controlling.

Even when the ALJ does not give a treating physician's opinion controlling weight, the opinion cannot simply be ignored. "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The same or similar factors are used to assess other medical opinions offered in the case.

Dr. Bustos, Plaintiff's treating physician, completed a physical residual functional capacity questionnaire on July 5, 2011, at the request of Plaintiff's counsel. R. 512–16. Dr. Bustos opined that Plaintiff's experience of pain or other symptoms are severe enough to constantly interfere with the attention and concentration needed to perform even simple work tasks. R. 513. She noted Plaintiff could walk one city block without rest or severe pain, could sit 45 minutes or more than two

hours at one time before needing to get up, and could stand for 45 minutes or more than two hours at one time before needing to sit down or walk around. R. 513. But Dr. Bustos subsequently indicated that Plaintiff could stand or walk less than two hours and sit for about two hours in an eight-hour work day. R. 514. She then opined that Plaintiff would need to walk for ten minutes every hour. She noted that Plaintiff could occasionally lift less than ten pounds, rarely lift ten pounds, and never lift fifty pounds. *Id.* Dr. Bustos reported Plaintiff could rarely look down or hold her head in a static position and could occasionally turn her head left or right and look up. R. 515. She indicated Plaintiff could rarely twist, stoop, or crouch/squat; occasionally climb stairs; and never climb ladders. Dr. Bustos noted Plaintiff would be absent from work about three days per month. *Id.* She concluded Plaintiff would be unable to focus or concentrate at work or perform a physical job. R. 516.

The ALJ recognized that Dr. Bustos is a highly trained physician who personally observed and examined Plaintiff. Nevertheless, he concluded her opinion was entitled to little weight because it was inconsistent within itself and the overall record. R. 157. The ALJ reasoned that Dr. Bustos did not provide a citation to an impairment or treatment note that supported her extreme limitations. Plaintiff asserts that if the ALJ was unclear about any aspect of Dr. Bustos' opinion, he should have contacted Dr. Bustos for clarification. Although an ALJ may request that a physician clarify her opinion, he is only required to do so when the medical support for a disability decision is not readily discernable. *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009). In this case, the ALJ's decision was supported by substantial medical evidence, albeit evidence that conflicted with Dr. Bustos' opinion. Again, Dr. Bustos does not explain how she arrived at her determination that Plaintiff had such extreme limitations. It thus follows that if, as I have already determined, the ALJ's credibility

17

assessment is not patently wrong, his assessment of Dr. Bustos' opinion is not in error. Dr. Bustos' opinion was not well supported by medically acceptable clinical and laboratory diagnostic techniques and it was inconsistent with other substantial evidence, including her own treatment notes, as well as the opinions of the state agency consultants who reviewed the record. In sum, nothing in the medical record supports the substantial limitations Dr. Bustos reported in July 2011. The ALJ rightly noted that Dr. Bustos' opinions were more extreme than the medical record warranted and appropriately relied on the objective medical evidence and the lack of any support in Dr. Bustos' own records to discount her opinions about Plaintiff's limitations. The ALJ provided sensible grounds for giving less weight to Dr. Bustos' opinion and provided "an accurate and logical bridge" between the evidence and his conclusions. *Roddy*, 705 F.3d at 636.

Plaintiff next claims that the ALJ erred in his evaluation of the opinion of Dr. Centena, a physician who evaluated Plaintiff in April 2013. As to the mental abilities and aptitudes Plaintiff needed to do unskilled work, Dr. Centena determined Plaintiff had no useful ability to function in the following areas: remembering work-like procedures; maintaining attention for two hour segments; maintaining regular attendance and being punctual within customary, usually strict, tolerances; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly distracted; completing a normal workday and workweek without interruptions from psychologically based symptoms; and performing at a consistent pace without an unreasonable number and length of rest periods. He found she was limited but satisfactory in the following areas: understanding and remembering very short and simple instructions; carrying out very short and simple instructions; making simple work-related decisions; asking simple questions or requesting assistance; accepting instructions and responding appropriately

18

to criticism from supervisors; getting along with co-workers or peers without unduly distracting them or exhibiting behavior extremes; responding appropriately to changes in a routine work setting; dealing with normal work stress; and being aware of normal hazards and taking appropriate precautions. He explained that Plaintiff continues to have low frustration tolerance as well as impaired concentration and she is limited physically due to her chronic low back pain. R. 995.

As to her mental abilities and aptitudes to do semi-skilled and skilled work, Dr. Centena found Plaintiff had no useful ability to function in carrying out detailed instructions. He found she was limited but satisfactory in the following areas: understanding and remembering detailed instructions; setting realistic goals or making plans independently of others; dealing with stress of semiskilled and skilled work; interacting appropriately with the general public; maintaining socially appropriate behavior; adhering to basic standards of neatness and cleanliness; traveling in unfamiliar places; and using public transportation. He explained Plaintiff feels phobic when exposed to unfamiliar environments and gets very anxious and disorganized. R. 995–96. Dr. Centena found marked limitations in restrictions of activities of daily living; moderate difficulties in maintaining social functioning; frequent deficiencies in concentration, persistence, or pace; and one or two repeated episodes of decompensation. He concluded Plaintiff had a complete inability to function independently outside the area of her home. R. 996. He also found she would be absent from work more than four days per month. R. 997.

The ALJ gave Dr. Centena's opinion little weight, finding it inconsistent with the overall record. He first observed Plaintiff had no problems working for nearly thirty years despite having both depression and anxiety, which suggests an ability to maintain regular attendance and work weeks as well as work at a consistent pace despite her symptoms. He noted that while Dr. Centena

19

opined Plaintiff was unable to maintain attention for two hours, Plaintiff testified she was able to read for four hours and finish what she started. He also indicated Plaintiff reported she could manage her personal hygiene, perform household chores, read for multiple hours per day, care for her sister, manage money, shop, participate in book club, travel, and prepare meals, which suggested better activities of daily living and an ability to maintain concentration, persistence, and pace than Dr. Centena observed. The ALJ further indicated Dr. Centena's opinion is inconsistent with the longitudinal record, which demonstrates Plaintiff had GAF scores above 50 and as high as 75, describes Plaintiff as doing well and stable on medication, and notes Plaintiff having rather unremarkable findings during objective mental status evaluations. R. 159.

Although the ALJ gave Dr. Centena's opinion little weight, Plaintiff claims he did not. As an initial matter, Plaintiff asserts the ALJ applied the wrong standard in assessing Dr. Centena's opinion. An ALJ must give controlling weight to the treating source's opinion if it is "not inconsistent" with other substantial evidence in the record. *See* SSR 96-8p; 20 C.F.R. § 404.1527(c)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."). This standard presumes the prominence of a treating physician's opinion and requires that the ALJ give the treating source's opinion less than controlling weight only if it is inconsistent with other evidence in the record. Here, the ALJ stated "Dr. Centena's opinion is not consistent with the longitudinal record." R. 159. But this phrasing does not require remand because the ALJ thoroughly explained that the record did not support the opinion. Stated differently, the ALJ applied the proper "not inconsistent" standard in discussing the substantial evidence in the record that was inconsistent with Dr. Centena's opinion.

Next, Plaintiff asserts that the ALJ erred in discounting Dr. Centena's opinion because her work history suggested she was able to work for thirty years, despite having depression and anxiety. R. 159. Although the "fact that a person holds down a job doesn't prove that he isn't disabled," *see Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003), an ALJ may rely on work history to demonstrate that a plaintiff's symptoms are not as limiting as she alleged. That is what the ALJ did here. Rather than concluding Plaintiff had the sufficient residual mental capacity to work full time based on her ability to work for thirty years, he found that the fact that Plaintiff's anxiety did not interfere with her ability to perform her work in the past was inconsistent with the extreme limitations Dr. Centena found. In short, the ALJ did not err in relying on Plaintiff's work history as a reason for limiting the weight afforded to Dr. Centena's opinion.

Plaintiff also argues the ALJ erred in dismissing Dr. Centena's opinion that Plaintiff had one to two extended episodes of decompensation because the ALJ reasoned periods of decompensation required extended inpatient hospitalization. Although a decompensation does not necessarily require a hospitalization, it does require that the record demonstrate that Plaintiff had an exacerbation in symptoms or signs that would ordinarily require increased treatment. Here, no evidence supported Dr. Centena's conclusions regarding episodes of decompensation. Accordingly, the ALJ did not error in giving this portion of Dr. Centena's opinion little weight.

Plaintiff further asserts that the ALJ improperly relied upon her activities of daily living to discredit Dr. Centena's opinion. But as explained earlier, the ALJ appropriately assessed Plaintiff's activities and could rely on them in assessing Dr. Centena's opinions. Just as with Dr. Bustos' opinion, the ALJ concluded no evidence of record supported Dr. Centena's opinion. The ALJ thoroughly discussed both the medical and non-medical evidence in making his determination. In sum, the ALJ did not err in assessing the weight of Dr. Centena's opinion.

The ALJ credited the opinions of the state agency physicians who offered opinions on Plaintiff's functional capacity based on their review of the record. Dr. Syd Foster and George Walcott opined that Plaintiff remains capable of performing light exertional work. R. 157. The ALJ gave these opinions great weight because state agency consultants are highly trained medical providers who are familiar with the rules and regulations of disability determinations. *See* SSR 96-6p; 20 C.F.R. § 1527(e)(2)(i) ("State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation."). The ALJ also found that their opinions are consistent with the overall record. R. 157. In addition, the ALJ gave some weight to the opinion of Dr. Roger Rattan, a state agency mental health consultant, who opined that Plaintiff did not have a severe mental health impairment. He reasoned that although Dr. Rattan's opinion is consistent with the record, Plaintiff's need for partial hospitalization and ongoing treatment following the program and her reported suicide attempt suggest her conditions are more severe than Dr. Rattan found. R. 158. The ALJ's evaluation of these medical opinions was appropriate. In sum, the ALJ did not err in assessing the medical opinions of Plaintiff's treating and examining physicians.

## C. RFC

Plaintiff next challenges the ALJ's assessment of her RFC. A claimant's RFC specifies the most that a claimant can do despite the physical or mental limitations imposed by her impairments. 20 C.F.R. § 404.1545(a)(1). An ALJ assesses a claimant's RFC "based on all the relevant evidence" in the case record, including severe and non-severe impairments as well as medical and non-medical evidence. *Id.* § 404.1545(e). The ALJ's hypothetical question to the VE must then incorporate all

of the limitations included in the RFC. *O'Connor–Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010); *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). Even though the SSA must consider opinions from medical sources, the "final responsibility" for determining a claimant's RFC is reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(2).

Plaintiff asserts the ALJ failed to properly inform the VE of all of her supported limitations. First, Plaintiff claims the ALJ erred in failing to fully inform the VE of her moderate limitations in concentration, persistence, and pace (CPP). The ALJ gave great weight to the opinion of Dr. Jeremy Meyers, a consulting psychologist who evaluated Plaintiff in September 2011 regarding Plaintiff's limitations as they relate to her mental impairments. Dr. Meyers indicated that Plaintiff had the ability to understand, remember, and carry out simple instructions, respond appropriately to supervisors and coworkers, maintain concentration and attention, as well as withstand routine work stress and adapt to changes. The ALJ noted Dr. Meyers is a highly trained psychologist who personally observed and examined the claimant and gave his opinion significant weight because it was consistent with Plaintiff's objective performance during mental status evaluations and her admitted activities of daily living. But the ALJ gave Dr. Meyers' opinion that Plaintiff may struggle with work pace due to her physical problems little weight because it is outside his area of expertise. R. 158. Plaintiff does not challenge the weight the ALJ gave to Dr. Meyers.

At steps two and three, the ALJ did not explicitly discuss Dr. Meyers' assessment and instead relied on Plaintiff's activities of daily living to conclude that Plaintiff had no more than moderate difficulties in CPP. R. 152. Based upon the entire record, the ALJ found that Plaintiff had the RFC to perform light work but was limited to "no more than frequent reaching overhead with the right upper extremity and no work on ladders, ropes, scaffolding, or at unprotected heights. She is also

mentally limited to simple, routine, repetitive tasks requiring only simple work-related decisions with few changes in the routine work setting and no more than occasional interaction with supervisors, coworkers, and the general public." R. 153.

Plaintiff asserts that the CPP limitations the ALJ found must be included in the hypothetical question to the VE. Under Seventh Circuit precedent, it is well-established that "both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) (quoting *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014)). In particular, the Seventh Circuit has found fault when the ALJ translates a finding of moderate limitations in CPP into an RFC limiting the plaintiff to simple, routine, and repetitive tasks. *See O'Connor–Spinner*, 627 F.3d at 620 (rejecting argument that "an ALJ may account generally for moderate limitations on concentration, persistence or pace by restricting the hypothetical to unskilled work"). But where a medical source, whose opinion the ALJ reasonably accords great weight, translates his own findings that the claimant may have moderate difficulties in CPP into an ultimate conclusion that the claimant can nevertheless perform simple, routine, and repetitive work, the ALJ does not err. Thus, in *Johansen v. Barnhart*, the court held that the ALJ did not err in finding that despite the plaintiff's moderate limitations in his ability to maintain a regular schedule and attendance, and in his ability to complete a normal workday and workweek without simple interruptions from psychologically-based symptoms, he could still perform repetitive, low-stress work:

> The ALJ did not err in relying on Dr. Matkom's assessment of Johansen's mental RFC. Both Dr. Matkom and Dr. Berney found that Johansen was essentially "moderately limited" in his ability to maintain a regular schedule and attendance, and in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms. Dr. Matkom, however, went further and

24

translated those findings into a specific RFC assessment, concluding that Johansen could still perform low-stress, repetitive work. Dr. Berney, on the other hand, did not make an RFC assessment (nor did state-agency physician Ingison). Thus, because Dr. Matkom was the only medical expert who made an RFC determination, the ALJ reasonably relied upon his opinion in formulating the hypothetical to present to Goldsmith.

314 F.3d 283, 288–89 (7th Cir. 2002).

In this case, Dr. Meyers did not complete a mental residual functional capacity assessment (MRFCA) or note the specific ways Plaintiff is limited in the broad functional area of CPP. Instead, he simply opined that Plaintiff "has the ability to understand, remember, and carry out simple instructions subject to physical limitations." R. 613. He also concluded Plaintiff should "be able to respond appropriately to supervisors and coworkers" and that maintaining "concentration and attention should be manageable." *Id.* The ALJ's RFC assessment reasonably captured these limitations.

After all, a claimant's RFC is "the most [the plaintiff] can still do despite [the plaintiff's] limitations," 20 C.F.R. § 404.1545(a)(1), not what she can do with ease or without moderate difficulty. This is particularly important to note when one considers what the term "moderate" is intended to mean in this context. The recent rule revisions by the SSA clarify that a "moderate" limitation means that a plaintiff's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." SSA, Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138, 66164 (Sept. 26, 2016) (effective January 17, 2017). Although the revised regulations became effective after the hearing was held in this case, the definitions "are consistent with how [the SSA's] adjudicators have understood and used those words in [the SSA's] program since [the SSA] first introduced the rating scale in 1985." 81 Fed. Reg. 66147. As a result, the

definitions set forth in the new rules "do not represent a departure from prior policy." *Id.*; *see also Capman v. Colvin*, 617 F. App'x 575, 579 (7th Cir. 2015) ("A moderate limitation is not a complete impairment." (citing *Roberson v. Astrue*, 481 F.3d 1020, 1024 (8th Cir. 2007))). Thus, moderate difficulty does not mean that the claimant is unable to perform the activity or task. I find no error in the ALJ's consideration of the limiting effects of Plaintiff's mental impairments.

Plaintiff also asserts that the ALJ arbitrarily created the limitation restricting Plaintiff to no more than frequent reaching overhead with the right upper extremity. R. 154. She maintains that the ALJ was required to evaluate Plaintiff's shoulder impingement syndrome in a function-by-function assessment in accordance with SSR 96-8p. "Although the 'RFC assessment is a function-by-function assessment,' SSR 96-8p, the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient." *Knox v. Astrue*, 327 F. App'x 652, 657 (7th Cir. 2009) (citations omitted). Here, the ALJ supported his findings regarding the limitations created by Plaintiff's right shoulder impairment with substantial evidence. He indicated that an MRI of Plaintiff's right shoulder revealed a hooked acromion and teninosis but no full thickness tear of the rotator cuff. He explained that Plaintiff attended a follow-up visit during which physicians determined she had positive impingement with tenderness over her acromioclavicular joint, and she ultimately underwent surgical intervention for her symptoms in 2009. R. 155. Plaintiff does not point to any evidence that conflicts with the ALJ's conclusion regarding her right shoulder pain.

In addition, Plaintiff claims the ALJ failed to explain why he gave no fingering and handling limitations. Plaintiff notes that she had surgery on her left wrist for carpal tunnel and received injections for her thumb. ECF No. 13 at 35. Yet, Plaintiff cites no evidence in the record in which

a physician opined that her carpal tunnel syndrome or the osteoarthritis in her left thumb required fingering and handling accommodations. In short, the ALJ did not err in failing to create limitations related to Plaintiff's fingering and handling.

Finally, Plaintiff argues that the ALJ failed to include Plaintiff's cane use in the RFC assessment. Yet, the ALJ was justified in finding that Plaintiff's cane use did not require a limitation in the RFC. He reasoned that Plaintiff was documented walking with a normal gait upon multiple examinations without mention of a need for a cane and walking up and down a flight of stairs ten times with a ten pound weight without difficulty. In addition, the ALJ noted there was no prescription for a cane anywhere in the record. R. 157. Therefore, the ALJ built an accurate and logical bridge from the evidence to his conclusion that Plaintiff did not need a limitation regarding her cane use.

## CONCLUSION

For the reasons above, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this  19th  day of March, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court